# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DERRICK E. BROOKS,

            Plaintiff,

v.

CAPTAIN GLOUDEMANS, LT. SERRANO, R. SMITH, M. SMITH, S. ANDERSON, CO GOTTI, SGT. STINE, and CO MARTEN,

            Defendants.

Case No. 16-CV-77-JPS

**ORDER**

**1.**     **INTRODUCTION**

Plaintiff Derrick Brooks ("Brooks"), a prisoner, brings this action pursuant to 42 U.S.C. § 1983 against Defendants, prison officials at Racine Correctional Institution ("Racine"), alleging that some of them used excessive force against him and that the others failed to protect him from the use of force, and that they subjected him to an unconstitutional strip search. Defendants filed a motion for summary judgment on December 1, 2016. (Docket #18). Pursuant to the Federal Rules of Civil Procedure and the Court's Local Rules, the deadline for Brooks to respond was January 3, 2017. *See* Civ. L. R. 56(b)(2). To date, Brooks has filed nothing in response to the motion. Therefore, the motion will be addressed in its unopposed form and, for the reasons explained below, it will be granted.

**2.**     **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the

applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The non-movant need not have more or better evidence than his opponent, but he must present "appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

**3. RELEVANT FACTS**

Because Brooks failed to respond to Defendants' statement of facts submitted in connection with their motion, the Court will consider them undisputed. Fed. R. Civ. P. 56(e); Civ. L. R. 56(b)(4); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission."); *Hill v. Thalacker*, 210 F. App'x 513, 515 (7th Cir. 2006) (noting that district courts have discretion to enforce summary judgment rules against *pro se* litigants). Only those facts necessary to the disposition of the motion are recounted below.

**3.1 The November 20, 2014 Use of Force**

During the relevant period, Brooks was an inmate at Racine. Defendants are correctional officers of various ranks. On November 20, 2014, Brooks ingested K-2, a form of synthetic marijuana, and suffered a psychotic episode. At approximately 6:45 p.m. that day, there was a loud crash and yelling coming from the north dayroom of the Rock Unit at Racine. Defendants R. Smith, C.O. Marten ("Marten"), and Sgt. Stine ("Stine") responded and observed a table flipped over and Brooks yelling at another

inmate. Brooks was screaming, "I'm a fighter" over and over again, and then walked up to another inmate and punched him at least once in the face.

Stine ordered Brooks to stop yelling and he and R. Smith attempted to separate the two inmates. Brooks then ran through the hallway from the north side of the unit to the south side of the unit. R. Smith and Stine pursued Brooks through the hallway, ordering him to stop and to put his hands behind his back.

R. Smith caught up to Brooks and brought him to the ground in the south dayroom. Brooks continued to ignore multiple directives to stop resisting and to place his hands behind his back. Stine and Marten arrived on the scene to assist in gaining control of the situation and placing Brooks in mechanical restraints on his wrists and ankles. Marten attempted to secure Brooks's legs, but Brooks continued to be combative and disregarded orders to stop resisting. Two other correctional officers who are not named as defendants arrived and assisted Marten with securing Brooks's legs in leg irons. Due to Brooks's combative behavior, the restraints were not able to be double-locked to prevent them from tightening further. At this same time, Stine secured Brooks's right arm. While Brooks was being placed in the restraints, he continued to be combative, spitting blood, and continuously yelling, "I am Jesus! I am a murderer! I am God."

Additional officers, including Defendants M. Smith, Anderson, Sgt. Goettl ("Goettl"),[1] Lt. Serrano ("Serrano"), and Capt. Gloudemans ("Gloudemans") arrived in response to the emergency team call. When they arrived, the responding officers already had Brooks "decentralized"—which the Court understands to mean "pinned"—on the floor and in mechanical

---

[1]This defendant was mis-identified in Brooks' complaint as "CO Gotti."

restraints. A make-shift spit mask was placed over Brooks's face as he was spitting blood at staff. Even while in restraints, Brooks continued to be combative. He kept screaming statements such as, "I am a fighter, I am a fighter, I am Jesus, I am God," and "fuck white people." After Brooks was fully restrained and supervised by several officers, Serrano determined that Brooks should be taken to the segregation unit. He ordered staff to assist Brooks to his knees, but Brooks actively resisted by kicking and swinging his arms and legs. Serrano explained to Brooks that if he did not comply, Serrano would be forced to use a taser. Brooks responded incoherently, including claiming to be "Jesus" again and again. Serrano again directed Brooks to comply with being assisted up to his knees, but Brooks refused all directives and continued to be combative, so in order to move Brooks to the segregation unit, Serrano activated a taser on Brooks's upper back and shoulder. It did not produce any results.

Nevertheless, the team was able to get Brooks standing and walked about five to seven feet out of the unit with him before Brooks became resistant again. Serrano explained to Brooks that if he did not comply, Serrano would have to use the taser on him again. Brooks continued to resist. As a result of Brooks's resistance, he was again decentralized to the ground by staff, and Serrano was able to dry stun Brooks on his back with the taser.[2] After the taser stopped, Brooks continued to yell, "I'm Jesus, fuck you bitches" and "I'll take all of you." Brooks continued to be noncompliant while being escorted. This included dragging his legs, not walking, and actively trying to break the compliance holds of the escorting officers. Since the distance to the segregation building was too far for the officers to carry

---

[2]A dry stun is when the taser is placed directly on the body and discharged without probes. This is typically done when at a close range.

Brooks, a flatbed cart was used. Even after Brooks was placed on the flatbed cart, he continued to resist the officers by flailing his body, trying to break the officers' holds, and incoherently yelling.

Serrano activated the taser at least two more times during the escort. After every deployment of the taser, Serrano tried to talk to Brooks and give him direction, but Brooks went back to being resistant and yelling, "I am Jesus," "I am God," and "I am a murderer." Brooks continued to resist by attempting to kick and jerk his body away and trying to break the compliance holds of the officers. Because the taser did not have the desired effect, Stine eventually delivered three knee strikes to Brooks's lower abdomen in an attempt to gain compliance. After this, Brooks became less resistant and the officers were able to escort him the rest of the way to the segregation unit.

### 3.2. The November 20, 2014 Staff-Assisted Strip Search

Once an inmate is transferred to the segregation unit, they must undergo a strip search before they are placed in a cell. There are two types of strip searches: staff-assisted and visual. A visual search is done by taking an inmate to a small cell called a strip cell, taking handcuffs off the inmate once they are in the strip cell, and letting the inmate manipulate all of his own body parts. Because the inmate must be moved and handcuffs taken off, not all situations can be handled by doing a visual strip search. If an inmate has demonstrated non-compliance and force has to be used, the inmate is not given the choice of a visual strip search. A staff-assisted strip search is done instead to ensure staff and inmate safety.

In this case, due to Brooks's assaultive behavior and continued noncompliance, once the officers arrived in the segregation unit, Serrano gave staff an order to perform a staff-assisted strip search on Brooks for

safety and security concerns and in accordance with Wis. Admin. Code § DOC 306.17(2). Brooks was escorted into the shower area for the search. Serrano supervised the cutting off of Brooks's clothing and the subsequent strip search by an officer who is not named as a defendant here. While one officer cut off Brooks's clothes, Anderson began to remove Brooks's socks. Stine and Anderson observed two small green balloons filled with an unknown substance fall out of his sock onto the floor. Upon later testing, it was determined that the balloons contained K-2. Serrano avers that the officers completed the remainder of the strip search after discovering the balloons in order to ensure that Brooks had no other contraband secreted on his person. None of the named defendants actually participated in the search except Serrano as a supervising officer.

Brooks alleges in his complaint that during the search, officers sexually assaulted him by touching his genitals and buttocks. Serrano avers that the search was conducted in accordance with the applicable correctional policies and procedures and that Brooks was not sexually harassed during the search. He also reports that Brooks never complained at the time of the search that he found the officers' conduct harassing.

After the search, Brooks was taken to a local hospital for treatment of his injuries. The medical staff reported superficial abrasions and, in a follow-up visit the next day, noted that Brooks had swelling in his wrists resulting from struggling against the officers' restraints. He did not sustain any fractures, and he was prescribed ice packs and Tylenol for the joint swelling.

4.  ANALYSIS

Upon screening Brooks' complaint, the Court permitted the following three claims to proceed: (1) an Eighth Amendment claim that Defendants used excessive force on him on November 20, 2014; (2) an Eighth

Amendment claim that Defendants failed to protect him from other prison officials' use of excessive force on November 20, 2014; and (3) Fourth Amendment and Eighth Amendment claims that Defendants subjected him to an unconstitutional strip search on November 20, 2014. *See* (Docket #8 at 10). On the undisputed facts in this case, each of Brooks' claims fails as a matter of law. The Court will address each claim in turn.

### 4.1 Excessive Force and Failure to Protect

First is Brooks' claim that Defendants used excessive force against him on November 20, 2014. The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain" on prisoners. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). When an official is accused of using excessive force, the core inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *Santiago v. Walls*, 599 F.3d 749, 757 (7th Cir. 2010). Several factors are relevant to this determination, including the need for force, the amount applied, the threat the officers reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury caused to the prisoner. *Hudson*, 503 U.S. at 7; *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004). The Supreme Court has instructed that the question is not whether the force employed was strictly necessary, viewed in hindsight, but whether the force employed was motivated by "obduracy and wantonness, not inadvertence or error in good faith." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

Here, it is uncontested that Brooks caused a major disturbance by upending a table, screaming incoherently, and punching another inmate. Brooks' violent rage necessitated a response from correctional officers, who are charged with the unenviable task of maintaining discipline in the prison

environment. *See id.* at 321–22 ("When the 'ever-present potential for violent confrontation and conflagration' ripens into actual unrest and conflict, the admonition that 'a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators' carries special weight.") (internal citations omitted). The officers gave repeated direction for Brooks to stop yelling and refrain from resisting their attempts to subdue him. Yet he forcefully resisted at every turn, spitting blood in their faces and attempting to strike them and squirm from their grasp. This is just the sort of blatantly insubordinate and dangerous conduct that necessitates the judicious application of force.

Moreover, here Defendants only escalated the force they employed—from manual handling to tasing (several times) to "knee strikes"—as lesser measures proved ineffective. As such, this case is analogous to *Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012). There, the officer first ordered the inmate to "get against the wall," which the inmate refused to do. *Id.* at 1045. The officer bent the inmate's wrist, but still the inmate did not comply. *Id.* Finally, he "slammed" the inmate against the wall. *Id.* The Seventh Circuit did not find this use of force excessive, observing that the officer "did not use any force until [the inmate] disobeyed a command that was designed to maintain order within the prison; and, when [he] applied modest force, [the inmate] remained defiant. [The officer] did not violate the Constitution by applying additional force." *Id.* at 1046; *see also Burton v. Ruzicki*, 258 F. App'x 882, 884 (7th Cir. 2007) (no excessive force where officer escalated use of force in the face of "an insubordinate inmate whom she knew posed an escape and assault risk and had caused other disturbances recently").

The Court, viewing as a whole the events of November 20, 2014, finds that Defendants' escalation of force was not constitutionally impermissible. Even the repeated use of the taser gun, though it admittedly can cause severe pain, *see Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009), was not unjustified under these circumstances, where officers were presented with a defiant, aggressive, and manic inmate bent on causing harm to everyone near him, and officers gave repeated warnings that a taser would be employed if noncompliance continued, *see Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984) ("The use of mace, tear gas or other chemical agent of the like nature when reasonably necessary. . .to subdue recalcitrant prisoners does not constitute cruel and inhuman punishment."); *Forrest v. Prine*, 620 F.3d 739, 745–46 (7th Cir. 2010) (use of taser was not inappropriate where the plaintiff was intoxicated, defiant, belligerent, was clenching his fists and yelling obscenities, and had attacked another officer earlier that evening); *Lewis*, 581 F.3d at 477 ("In many circumstances—often when faced with aggression, disruption, or physical threat—compelling compliance with an order is a valid penological justification for use of a taser."). And there is no evidence that Defendants' use of force, whether through the taser or otherwise, caused Brooks any lasting harm.

At a minimum, on these facts, no reasonable jury could conclude that the use of force was undertaken maliciously to cause Brooks harm rather than in a good-faith effort to subdue Brooks' alarmingly violent outbursts. *Hudson*, 503 U.S. at 7; *Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (noting that "[p]rison administrators. . .should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security"). As a result, Brooks' claim for use of excessive force must be

dismissed. Further, since no excessive force was employed against him on November 20, 2014, no defendant can be accused of failing to protect him from such force. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). Thus, Brooks' failure to protect claim must also be dismissed.

### 4.2 Staff-Assisted Strip Search

Brooks' remaining claim is that the staff-assisted strip search he was subjected to on entering segregation was unconstitutional. Under certain circumstances, a strip search in prison can constitute cruel and unusual punishment, in violation of the Eighth Amendment. *See Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009). This occurs when the search was motivated by a desire to harass or humiliate rather than by a legitimate justification, such as the need for order and security. *See Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003). Even when supported by penological justification, a search may still violate the Eighth Amendment if "conducted in a harassing manner intended to humiliate and cause psychological pain." *Mays*, 575 F.3d at 649. The Seventh Circuit has summarized that "where there is no legitimate reason for the challenged strip-search or the manner in which it was conducted, the search may 'involve the unnecessary and wanton infliction of pain' in violation of the Eighth Amendment." *King v. McCarty*, 781 F.3d 889, 897 (7th Cir. 2015) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)). Nevertheless, while "[t]here is no question that strip searches may be unpleasant, humiliating, and embarrassing to prisoners, [] not every psychological discomfort a prisoner endures amounts to a constitutional violation." *Calhoun*, 319 F.3d at 939.

Strip searches may also violate the Fourth Amendment's prohibition on unreasonable searches. In this context, courts give considerable deference to judgments of prison officials about matters of institutional safety and

security. *See Conyers v. Abitz*, 416 F.3d 580, 584 (7th Cir. 2005). Nevertheless, the Fourth Amendment continues to protect some degree of privacy for convicted prisoners, at least when it comes to bodily searches, although that protection is significantly lessened by the punitive purposes of prison and the very real threats to safety and security of prisoners, correctional staff, and visitors. *See Peckham v. Wis. Dep't of Corr.*, 141 F.3d 694, 697 (7th Cir. 1994). The Seventh Circuit has emphasized that "it is difficult to conjure up too many real life scenarios where prison strip searches of inmates could be said to be unreasonable." *Id.* In assessing the reasonableness of any search, the court should balance "the scope of the particular intrusion, the manner in which it was conducted, the justification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559. Additionally, the Fourth Amendment is only implicated when there is an intrusion *into* the body. *King*, 781 F.3d at 900.

Neither the Fourth nor the Eighth Amendment proscribe the search conducted in this case. There can be no question here that use of a staff-assisted strip search was justified. First, the use of a strip search on inmates entering segregation is expressly permitted under the Wisconsin Administrative Code, and Brooks has not challenged the constitutionality of that provision. *See* Wis. Admin. Code § DOC 306.17(2).[3] The search helps ensure that contraband does not enter the highly secured segregation units, where the most unruly offenders are housed. *See Simpson v. Mason*, No. 13–cv–776–jdp, 2015 WL 5918928, at *13 (W.D. Wis. Oct. 9, 2015) (a staff-

---

[3]The mere fact that the search was completed pursuant to prison policy is not sufficient on its own to justify it, *see King*, 781 F.3d at 898, but that fact, coupled with Brooks' failure to offer reasons why this search policy is inappropriate, is part of the Court's holistic assessment of the constitutionality of the search.

assisted strip search "serv[es] the legitimate penological purpose of keeping the prison secure by ensuring that no prisoner transports contraband"); *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 132 S. Ct. 1510, 1517 (2012) ("[C]orrectional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities"); *see also Whitman v. Nesic*, 368 F.3d 981, 934 (7th Cir. 2004) (finding strip search prior to urinalysis justified on prison concerns about contraband smuggling). Moreover, Brooks' unrestrained, psychotic conduct could have suggested that he was under the influence of controlled substances, necessitating a thorough search of his person. In fact, such contraband was discovered when officers removed one of Brooks' socks.

Second, Serrano avers that the decision to perform a staff-assisted rather than visual strip search was predicated on Brooks' aggression and his unrelenting noncompliance prior to the search. It would have been unwise, in Serrano's estimation, to remove Brooks' handcuffs and allow him to remove his own clothing in light of his assaultive behavior mere minutes earlier. To maintain order, security, and the safety of both the officers and Brooks, Serrano concluded that a staff-assisted strip search was appropriate under the circumstances, and the Court will not second-guess that decision. *Cherry v. Frank*, No. 03–C–129–C, 2003 WL 23205817, at *11 (W.D. Wis. Dec. 4, 2003), *aff'd*, 125 F. App'x 63 (7th Cir. 2005); *Simpson*, 2015 WL 5918928, at *9 ("[P]rison officials do not violate the Eighth Amendment when they have legitimate reasons to deny a prisoner [the] choice" between a visual or staff-assisted strip search.) In sum, it cannot be said that there was no legitimate reason for a staff-assisted strip search and that it was done in order to harass or humiliate Brooks. *Calhoun*, 319 F.3d at 939; *Whitman*, 368 F.3d at 934 ("[O]nly those searches that are 'maliciously motivated, unrelated to

institutional security, and hence 'totally without penological justification' are considered unconstitutional.") (quoting *Meriwether v. Faulkner*, 821 F.2d 408, 418 (7th Cir. 1987)).

Nor was this search conducted in a constitutionally impermissible manner. During the search, officers removed his clothing and inspected his body, including his genital area and between his buttocks, consistent with Wisconsin Department of Corrections procedures. *See Scott v. Schneider*, Case No. 14–CV–908, 2016 WL 5340211, at *2 (E.D. Wis. Sept. 19, 2016) (describing staff-assisted strip search procedures). There is no indication that the search was done in a public setting, open to other inmates and guards of both sexes, or that the search occurred over a prolonged period. *See King*, 781 F.3d at 898.

And, contrary to the allegations of his complaint, there is no evidence that Brooks was sexually harassed during the search. Even assuming that during the search officers made contact with Brooks' genitals and buttocks (which is likely), this does not itself rise to the level of a constitutional violation. *Cherry*, 2003 WL 23205817, at *12 ("Any manual search of an individual's body will require some amount of manipulation of the genitals in order to accomplish the purpose of the search. Although 'grabbing' and 'tugging' could cause some discomfort and embarrassment, it does not rise to the level of 'unnecessary and wanton infliction of plain' so long as it occurs as part of an otherwise justified search."). There is no competent evidence that Defendants groped him, squeezed his genitals or buttocks, penetrated his anus, or engaged in other conduct outside the scope of a permissible staff-assisted strip search. *Simpson*, 2015 WL 5918928, at *10; *Scott*, 2016 WL 5340211, at *5; *Lewis v. Stephen*, 15-cv-051-jdp, 2016 WL 6638029, at *7 (W.D. Wis. Nov. 9, 2016) (finding that evidence of anal penetration during staff-assisted strip search could support jury finding of harassment or

humiliation). In short, the mere fact that Defendants may have touched his buttocks and penis to complete their search, without more, is not sufficient to state an Eighth or Fourth Amendment claim. *Simpson*, 2015 WL 5918928, at *10 ("Plaintiff seems to equate any unwanted touching with sexual assault but this is simply not the standard for prison strip searches."). Additionally, without evidence showing that there was penetration into Brooks' body, the search does not implicate the Fourth Amendment at all. *King*, 781 F.3d at 900.

In sum, the undisputed facts fall well short of demonstrating that Defendants' strip search was an "unjustified effort to humiliate [Brooks]" rather than a "routine" process grounded in legitimate safety and security concerns. *King*, 781 F.3d at 898; *Peckham*, 141 F.3d at 697. As a result, Brooks' claim relating to the November 20, 2014 strip search, whether analyzed under the Fourth or Eighth Amendment, must be dismissed.

**5. CONCLUSION**

Brooks failed to contest the facts Defendants proffered. Viewing those undisputed facts in the light most favorable to Brooks, the Court is obliged to conclude that each of his claims fails as a matter of law. This action will, therefore, be dismissed in its entirety.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment (Docket #18) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 19th day of January, 2017.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge